**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 12, 2016**

# In the Court of Appeals of Georgia

A16A0353. TERRY et al. v. CATHERALL et al.

BOGGS, Judge.

This appeal involves a controversy over surface water runoff between adjoining property owners. John Terry and Karen Correnty ("plaintiffs") appeal from the trial court's order granting summary judgment in favor of Leigh Catherall and Edie and Gillespie Smith (collectively "defendants"). The plaintiffs contend that the trial court erred in concluding that they had failed to create a genuine issue of material fact as to whether the defendants artificially increased water runoff from their property onto the plaintiffs' adjoining property. They also assert that the defendants were not entitled to summary judgment on their claims for punitive damages, attorney's fees and a permanent injunction. For the reasons explained below, we reverse the trial court's grant of summary judgment to the defendants on the plaintiffs' nuisance claim

and remand this case with the instruction that the trial court rule on the issues of punitive damages, attorney's fees, and permanent injunction.

"[I]n reviewing this summary judgment case, we must construe all evidence in favor of the nonmovant and need only determine whether *some* competent evidence supported plaintiff's claim, not whether *all* evidence supported that claim." (Emphasis in original.) *Rodrigues v. Ga-Pacific Corp.*, 290 Ga. App. 442, 447 (661 SE2d 141) (2008) (on motion for reconsideration). The following facts are undisputed: the plaintiffs moved into their home in October 2011; Catherall's home is partially behind and uphill from the plaintiffs' home; the Smiths' home is adjacent to Catherall's home and also partially behind and uphill from the plaintiffs' home; wood fences separate the plaintiffs' property from the defendants' property; the Smiths built an addition to their home in 1970 and they added a parking pad for a recreational vehicle in 2006; Catherall added a garage, additional driveway, and parking area in 1996 and a flagstone patio in 2007.

After purchasing the home in 2011, Mr. Terry noticed water coming from the defendants' lots onto his property. In particular, he observed water coming from a pipe embedded in the Smiths' parking pad onto his property during a rainstorm. He described the water as "[c]oming out of a pipe that's attached to the parking pad about

2

three feet before it hit the ground" with "the trajectory of the water coming out of the pipe . . . about three feet away from the wall for the parking pad." Terry testified that the water from this pipe goes "straight to [his] property. On one occasion, Terry observed water coming from the pipe onto his property while Mr. Smith was washing his motor home. Terry also testified that a great volume of water runs from the southwest corner of the Smiths' patio roof.

With regard to Catherall's property, Mr. Terry observed collected rainwater coming from two pipes near a parking pad on the northwest side of the Catherall house onto his property. He described the water coming out of the pipes "like a fire hose" during a heavy rain. He also testified that water from Catherall's patio and three-car garage is directed onto a different neighbor's property and then flows through to his property based on his observations after the Catherall's driveway was pressure-washed.

The owner of a landscaping company with expertise in drainage and landscaping testified that he observed water coming under a fence from the Catherall property "like a fire hose." He could tell water came from the Catherall property onto another neighbor's property before taking a turn onto the plaintiffs' property because "[t]here was a defined ditch through the yard where the vegetation had died and . . .

3

you could see the water. I mean it was active like a river literally running straight under the fence." He also observed water coming from the Smiths property into the plaintiffs yard. He testified that the Smiths and Catherall could help mitigate water runoff to the plaintiffs' property by planting monkey grass along the fence to reduce the speed of the water. In his opinion, the improvements made to the defendants' properties significantly increased the water runoff, but he did not do any water volume or velocity calculations. He testified that "adding impervious . . . areas increases velocity and water flow." He admitted that he did not have any knowledge of the drainage pattern on the defendants' properties before they added improvements.

The plaintiffs retained an expert witness, Dr. James Spotts, who has a master's degree in agronomy and a Ph.D. in soil physics. Dr. Spotts inspected the properties at issue and identified several specific locations where water from the defendants' properties flowed under the wood fences onto the plaintiffs' property. The water leaving the Smiths' property did not pass "under the fence uniformly over its entire length." He saw a drainage channel from the Smith's drain pipe and parking pad that "directed the water . . . toward the Terry property." He also observed that the Smiths did not have pads under the gutter downspouts "to absorb the impact energy of the

water as it came down." Additionally, he noticed where the water exited the Catherall property onto the adjoining neighbor's land and then turned to the right onto the plaintiffs' property.

He obtained measurements for the original footprint of the defendants' homes and the amount of increased impervious surfaces they added. The Smith house was originally approximately 2,668 square feet and they added an additional 3,728 square feet of impervious surface, an increase of "about 140%." The Catherall house was originally 2,681 square feet and they added an additional 6,612 square feet of impervious surface, an increase "by 250%." According to Dr. Spotts, the addition of impervious surfaces on both properties increased the volume and velocity of water flowing onto the plaintiffs' property because it prevented water from infiltrating into the soil. Dr. Spots admitted that he did not know the drainage patterns on the defendants' property before they added additional impervious surfaces, that he did not quantify the volume or velocity of water flowing from the defendants' property onto the plaintiffs' property, and that he did not measure the slope of the defendants' properties.

Following discovery, the defendants moved for summary judgment in their favor, asserting, in part, that no genuine issue of material fact existed as to whether

they caused an increase in the volume and velocity of water flowing onto the plaintiffs' property. The trial court agreed, concluding in nearly identical orders pertaining to each property:

> While Mr. Spotts provided calculations that Defendants increased [] the impervious surfaces of their Property . . . , Mr. Spotts did not conduct any tests to measure the velocity of water runoff from Defendants' Property, the volume of water flowing onto the Plaintiffs' Property, not the slope of Defendants' Property. Rather, Mr. Spotts appears to be relying solely on his calculations of impervious surface additions to speculate that Defendants artificially increased water runoff onto Plaintiffs' Property. Mr. Spotts' knowledge and expertise simply cannot overcome the lack of quantifiable data for his opinion on causation to amount to more than mere conjecture and speculation.

The trial court did not address any other grounds asserted in the defendants' summary judgment motions.

> In surface water run-off disputes where two lots adjoin, the lower lot owes a servitude to the higher, so far as to receive the water which naturally runs from it, provided the owner of the latter has done no act to increase such flow by artificial means. Thus, although property must accept the natural runoff of water from neighboring lands, an artificial increase or concentration of water discharge may give rise to a cause of action.

6

(Citations, punctuation and footnotes omitted.) *Green v. Eastland Homes*, 284 Ga. App. 643, 645 (1) (644 SE2d 479) (2007). The law can also properly be stated:

> One landed proprietor has no right to concentrate and collect water and thus cause it to be discharged upon the land of a lower proprietor in greater quantities at a particular locality or in a manner different from that in which the water would be received by the lower property if it simply ran down upon it from the upper property by the law of gravitation.

(Punctuation omitted.) *Sumitomo Corp. of America v. Deal*, 256 Ga. App. 703, 705 (1) (569 SE2d 608) (2002).

"Under Georgia law, in order to be held liable for nuisance, ownership of land by the tortfeasor is not an element, but control is; the essential element of nuisance is control over the cause of the harm. The tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." (Citation and punctuation omitted.) *Greenwald v. Kersh*, 265 Ga. App. 196, 198 (1) (593 SE2d 381) (2004). "Causation is an essential element of nuisance, trespass, and negligence claims. To establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury." (Citations and punctuation omitted.) *Toyo Tire North America Man. v. Davis*,

7

Ga. (Case No. S15G1804, decided June 6, 2016). "The existence of proximate cause is a question of fact for the jury, except in palpable, clear, and indisputable cases." (Citations, punctuation and footnote omitted.) *Sprayberry Crossing Partnership v. Phenix Supply Co.*, 274 Ga. App. 364, 365 (1) (617 SE2d 622) (2005).

In this case, as in *Toyo Tire*, supra, the defendants did not challenge the admissibility of the plaintiffs' expert testimony; instead, they asserted that the expert testimony was insufficient to create a genuine issue of material fact as to causation. We disagree. Dr. Spotts' testimony that the increased impervious surfaces on the defendants' property increased the volume and velocity of water flowing onto the plaintiffs' property was sufficient to create a genuine issue of material fact on the issue of causation. See *Toyo Tire*, supra, slip op. at 14-15 (2). "[T]he limited scope of the information used by the expert [does not] play a role in determining whether his testimony is competent." *Green*, supra, 284 Ga. App. at 647 (1). Instead, it "presents a jury question as to the weight which should be assigned the opinion." (Citations and punctuation omitted.) Id.

2. In their remaining enumerations of error, the plaintiffs contend that the trial court also erred by granting summary judgment in favor of the defendants on their claims for punitive damages, attorney's fees and a permanent injunction. The trial

8

court's order, however, does not address the viability of any of these claims, presumably because they became moot based on the trial court's conclusion that no genuine issue of material fact existed as to causation. "Thus, if we were to conclude that the trial court erred, it would be on account of an issue never ruled on below. [Cit.]" *Nebo Ventures v. Novapro Risk Solutions*, 324 Ga. App. 836, 848 (4) (752 SE2d 18) (2013). As "we do not think an appellate court properly ought to consider whether the trial court was wrong for any reason[,] . . . we conclude that it is appropriate for the trial court to address in the first instance whether triable issues of fact remain on the question" of punitive damages, attorney's fees, and a permanent injunction. (Citations and punctuation omitted.) Id.

*Judgment reversed and case remanded with direction. Barnes, P. J., and Rickman, J., concur.*